**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Crim. Case No. 25-389-EGS** |
| **v.** | |
| **JONAS TYLER MURPHY,** | |
| **Defendant.** | |

**UNITED STATES' MEMORANDUM IN AID OF SENTENCING**

Between December 2023 and June 2025, Jonas Murphy embezzled more than one million dollars from his employer. Although he was authorized to effect ACH transfers from his employer's political action committee to intended campaign recipients, he caused 211 unauthorized ACH transfers to his personal bank accounts. When his employer discovered that he had misappropriated funds and confronted him, he initially claimed the transactions were not fraudulent. He ultimately came clean, however, and with the assistance of family, managed to pay back every cent he stole and an additional $2,000 to cover accounting and legal expenses. Then, upon learning that he was the target of a federal criminal investigation, he continued his efforts to right his wrongs by having his attorney arrange a meeting with the government at which he fully confessed. He then pled guilty to a federal felony as soon as practicable.

There is no question that Murphy's conduct before he came clean was abhorrent. His actions since then, however, have been commendable. The United States Sentencing Guidelines Manual recommends a sentence of between 24 months and 30 months of incarceration. As part of the plea agreement, the United States capped its allocution at the bottom of that range. The probation officer who drafted Murphy's presentence investigation report recommends no prison, but rather a five-year probationary sentence. Based on the factors set forth at 18 U.S.C. § 3553(a), the Court should sentence Murphy to no more than 24 months in prison.

## I.    Background

Murphy was born in Pennsylvania in July 1994. He was formally adopted three months later by two exceedingly caring parents after his birth mother's parental rights were terminated. *See* PSR ¶ 32-35. His parents raised him in safe neighborhoods and provided him with a good childhood. PSR ¶ 33. After graduating from high school in 2012, he attended St. Joseph's University in Philadelphia for two years before transferring to the University of Illinois, where he earned his degree in political science. PSR ¶ 48.

In 2020, after gaining a few years of Capitol Hill experience working for a United States Senator, Murphy started a job with the Victim Organization, a trade association headquartered in the District of Columbia. He worked for the Victim Organization for just over five years, first as Manager of Government Affairs before being promoted to Director of Government Affairs. He also served as Treasurer of the Victim Organization's political action committee. His annual salary increased steadily during those five years from just over $80,000 in his first year to $120,000 in 2025. *See* PSR ¶ 9, 53.

Sadly, as Murphy's career with the Victim Organization progressed, he exploited the trust his employer placed in him by stealing $1,009,000 between mid-December 2023 and mid-June 2025.  Thus, in just 18 months, he stole what it takes the typical American household 12 years to earn. *See What is the income of a US household?*, USA FACTS, https://usafacts.org/answers/what-is-the-income-of-a-us-household/country/united-states (last visited May 7, 2026) (noting that the median household income in the United States was $81,600 in 2024). He then squandered money on things like an automotive membership, fancy clothes, and jewelry. *See* PSR ¶ 10.

Murphy perpetrated and concealed his embezzlement scheme in two ways. First, he presented ACH transfer templates that appeared to direct funds into political campaigns, but

because he altered the bank routing and account information, the funds were deposited into one of his six personal accounts instead. Second, he used his FEC reporting duties to conceal his crime by filing false reports, which included fictitious refunds to PAC donors and false payments to service providers. PSR ¶ 11.

When the Victim Organization realized what was going on, it confronted Murphy. He initially lied to his employer but ultimately fessed up to his conduct. He also—with parental assistance—paid back every dollar that he stole, which will leave him forever indebted to his exceedingly caring and generous parents.

When the government informed Murphy's attorney that Murphy was the target of a federal criminal investigation, Murphy quickly arranged to travel from Delaware to Washington to meet with the government at defense counsel's office in Washington. During that meeting, Murphy fully confessed to his criminal conduct and provided additional details regarding what motivated him to steal and how he spent the money. He then entered into a plea agreement with the United States and formally pled guilty as soon as the Court and parties were available.

Murphy's written statement to the probation officer who prepared his presentence investigation report included the following:

> I allowed personal insecurity and emotional dependence to cloud my judgment. I became caught up in a romantic relationship and wrongly believed that I needed to provide gifts or financial support to maintain that person's love. I was afraid of being abandoned and feared I would never find love again. The fear contributed to my decision-making, but I want to be clear: it does not excuse what I did. I alone am responsible for my choices.

PSR ¶ 14.

His statement also noted his great shame and remorse. *Id*. The government has no doubt that his remorse is genuine, that he has fully accepted responsibility for his behavior, and that he has taken and will continue to take steps to restore people's trust in him.

3

## II.    Sentencing Guidelines

The parties and the presentence investigation report writer agree that the following guidelines apply.

| | | |
|---|---|---|
| USSG § 2B1.1(a)(2) | Base Offense Level | 6 |
| USSG § 2B1.1(b)(1)(H) | Loss Amount: More than $550,00 | 14 |
| USSG § 3B1.3 | Abuse of Trust | 2 |
| USSG § 3E1.1 | Acceptance of Responsibility | -3 |
| USSG § 4C1.1 | Zero-Point Offender Adjustment | -2 |

PSR ¶ 15-24. Murphy has no criminal convictions and thus zero criminal history points. PSR ¶ 25-27. Based on a total offense level of 17 and CHC I, the guidelines recommend a sentence of 24 to 30 months' imprisonment and a fine of $10,000 to $95,000.  PSR ¶ 68, 82.

## III.    The 18 U.S.C. § 3553(a) Factors

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

Some of the applicable section 3553(a) factors warrant a guideline sentence.  Some do not.

### A. The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense

Murphy's embezzlement scheme was serious. For eighteen months he treated his employer's PAC account as a personal slush fund to let him impress a romantic partner. *See* PSR

¶ 14. Moreover, his criminal conduct was not limited to a few isolated incidents. Instead, it involved him deciding on more than 200 separate occasions to steal money for his personal benefit. Each time he initiated a fraudulent ACH transfer, he was presented with a choice—to steal or not to steal. For 18 months, he repeatedly chose to steal, resulting in him misappropriating a staggering amount of money. The nature and circumstances of his offense and need for the sentence to reflect the offense's seriousness weigh in favor of a guideline sentence.

**B. The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct**

Although the government hopes that Murphy has been specifically deterred from engaging in additional criminal conduct—his behavior since coming clean to his employer, including the full repayment of stolen funds, full confession to the government, and quick guilty plea certainly suggest as much—the Court's sentence must still promote respect for the law and deter the public from engaging in similar conduct. Accordingly, this factor weighs in favor of a custodial sentence to make it clear to would-be embezzlers that if they violate the trust that their employers place in them and steal $1 million, the penalty will include jail time.

**C. The History and Circumstances of the Defendant**

Murphy's history and circumstances are more complicated.

He was adopted and raised by two loving parents who provided him with an upbringing and support system to succeed. Yet there's no doubt that his birth mother's conduct while pregnant severely disadvantaged him. *See* PSR ¶ 39.

He was fortunate to have secured meaningful employment after college—first, as a staffer on the Hill and then as a valuable member of the Victim Organization. Yet he squandered the benefits of his professional achievements by stealing money from his employer.

He experienced the euphoria of falling in love. Yet, the relationship convinced him that he needed to provide gifts and financial support to maintain his partner's affection, which motivated him to steal.

He initially lied to his employer when confronted about the fraudulent transfers. Yet, he ultimately admitted what he had done. And unlike the supermajority of defendants, he made his victim entirely whole, and he did so before the government filed any charges in this case. Although he would not have been able to do that but for assistance from his parents, the fact that the victim recouped every stolen dollar is not only unusual but remarkable.

After Murphy was terminated from the Victim Organization in July 2025, he quickly secured employment with a hotel in Delaware earning three dollars above Delaware's minimum wage. PSR ¶ 50. He also started working for a real estate company but apparently was terminated from that job when the real estate company was contacted by a reporter following his guilty plea. *See* PSR ¶ 51. According to the presentence investigation report, he continues to work at the Delaware hotel. PSR ¶ 50. Notably, the hourly wage at the hotel is approximately one-third of what he made per hour at the Victim Organization in his final year of employment.

There is no question that Murphy's personal history and circumstances are complicated. His actions since admitting his fraud scheme to his employer, however, are not—full repayment of the stolen funds, full confession to the government, full acceptance of responsibility by quickly entering into a plea agreement and then pleading guilty, and continued employment at a job that pays just above Delaware's minimum wage. Thus, overall, his history and circumstances do not weigh in favor of a guideline sentence.

### D.  Unwarranted Sentencing Disparities

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see also United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533.

A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

According to the U.S. Sentencing Commission's Judiciary Sentencing Information, "During the last five fiscal years (FY2020-2024), there were 415 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 17 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure." PSR ¶ 90. Seventy-seven percent of those defendants received some sort of prison sentence with the average length being 15 months with a median sentence of 16 months. *Id.*

Although the individual circumstances of the 415 defendants referenced above are unknown, the mean and median sentences for defendants who received a custodial sentence and

fact that 23 percent did not receive any period of incarceration suggest that a guideline sentence in this case would in fact lead to an unwarranted sentencing disparity. Accordingly, this factor does not weigh in favor of imposing a guideline sentence.

### E.  The Need to Provide Restitution to the Victims of the Offense

As noted by the probation officer, because Murphy has already paid the victim back in full, there is no need to provide any restitution in this case. Accordingly, this factor weighs against a guideline sentence. ECF No 16.

### CONCLUSION

This is a remarkable case. Mr. Murphy overcame certain challenges that would have prevented others from achieving all that he did. But he also squandered advantages he enjoyed that many do not. Since committing his criminal scheme—which was extremely serious and warrants some incarceration—he has done everything he can to right the wrongs that he caused. Although a custodial sentence based on the totality of the section 3553(a) factors is warranted, a sentence above the bottom of the guidelines is not.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:   */s/ Kondi J. Kleinman*
Kondi J. Kleinman, Cal. Bar No. 241277
Assistant United States Attorney
Fraud, Public Corruption & Civil Rights Section
601 D Street, N.W. | Washington, D.C. 20530
202.252.6887 | kondi.kleinman2@usdoj.gov